Mr. Augustus, may it please the court. As the court is aware from the briefing in this matter, there are really two distinct and independent cases involved in this appeal. There is the 1933 Act case on the one hand involving Enron employee stock options, and then there's the 1934 Act case on the other hand involving the acquisition, the purchase of Enron common stock, Enron preferred stock by UBS retail clients. I want to begin today by focusing us on the 1933 Act case. The bottom line is that the district court simply was not faithful to the governing language of the 1933 Act. Instead, it relied on a fatally flawed case out of the District of New Jersey from almost 20 years ago, and as a result it led to fatally flawed conclusions. The 1933 Act case is about a confusion of context. The district court committed error because it failed to be mindful of context. This confusion is in one way understandable. We are dealing with two distinct contexts, but both of those contexts can be labeled with the same acronym, ESOP, or ESOP. Why don't you go through the elements of the claim and tell us how they're satisfied here? So under the 1933 Act case, there are two claims. One is under Section 11, statutory liability as an underwriter. The other is statutory liability as a seller under Section 12. If we take the Section 11 claim as an example, we have to have the sale of security involved. We have to have the sale of a security. There has to be a misrepresentation in the registration statement, and then you have to have the factual scenario of being an underwriter. Do you have a sale, or whether you have a security is a bit of a question, isn't it? I'm sorry, I could not hear. Whether you have a sale or you have a security is a bit of a question. Well, we have a security, and this is one of the issues, is that what is involved in these claims is the Enron employee stock option. And under the statutory definition of security under the 1933 Act, an option on stock, a stock option, is statutorily defined to be a security. It's right in the statute itself. So there should be no question that there is a security involved. The district court even said it in the opinion and then went on to sort of talk its way out of it. The question of sale, this is where the fatally flawed conclusions come from, from relying on the McLaughlin v. Sindent case out of the District of New Jersey from 1999. There was a confusion of context in that case. So the Sindent case involved stock options, but the district court in Sindent looked... Separate the issues so we can focus a minute. Either way you want to do it, either sale or security, take up sale first. That's the issue of sale. If you have a distribution to employees that's, in effect, mandatory, I've asked questions about how that can be a sale, and I thought that settled it against you. Well, so actually very important for this appeal, and I think determinative for this appeal, are the SEC's actions against Google Inc., 2005 enforcement action against Google Inc., and then just earlier this year, just several months ago, the SEC took another enforcement action against a company called Credit Karma Inc., and both of these enforcement actions against these companies found that the companies violated the 1933 Act, Section 5, by selling unregistered securities to its employees by granting them employee stock options under an employee benefit plan. So how do you explain Daniel, Supreme Court opinion in Daniel, where it says that participation in a non-contributory compulsory pension plan is not the equivalent of purchasing a security? Isn't that what Daniel said? Daniel did, and so Daniel's addressing the context... And isn't that different from what we had... ...of whether an interest, an employee's interest in a benefit plan is an investment contract, because that's one of those terms under the statutory definition of security. Daniel, Howey, the 1980 release, they're all looking at this question of, does this employee's interest in a benefit plan constitute an investment contract? Daniel sets out the parameters of what an investment contract is. After the 1980 release by the SEC, it quickly corrected itself in 1981 and said that its prior statement about non-contributory, you know, mandatory employment benefit plans were, was somewhat incomplete, and it went on to define what constitutes a voluntary contributory plan, and it said it's a plan where an employee has, at any point in time, a decision to make, an investment decision to make. The very nature of an employee's stock option, there's an investment decision to make. There's the investment decision of whether to exercise the option and then whether to invest your funds in exercising and acquiring the underlying stock. But there was a committee, was there not, if that's the right word to use, that decided which employees received the benefit? So Enron had a compensation committee that made the grant determinations, that's correct. And then UBS was the one who contracted with Enron to actually execute the entire distribution process. UBS was the one who notified Enron employees of the grant of a stock option, so therefore UBS was the one who distributed the grant of a stock option. UBS maintained all of the records regarding grants, regarding exercises. But the point of the question was that the, which I didn't make clear enough, the individual employee had no choice as to whether he or she was to be among the group that was chosen to receive the option. That is correct. But under the 1981 release by the SEC, they specifically say this is what defines a contributory voluntary plan. It is whether or not the employee, at any point in time, has an investment decision to make and, you know, to invest their funds. And just the very nature of an employee stock option requires the exercise of a decision, or requires a decision of whether or not to exercise the stock option, investing your money and buying the underlying stock. So appellants take the position that because of that investment decision that's inherent in a stock option, it is, under the 1981 release by the SEC, a voluntary contributory plan  And, again, the issue here is whether the no-sale doctrine applies. And if we look at Google, Inc., and we look at Credit Karma, Inc., we know definitively the SEC and these regulatory enforcement actions against these companies are making the determination that the no-sale doctrine does not apply to the granting of employee stock options, because if that were the case, these enforcement actions would be moved. There wouldn't be any need for them. They specifically determine that the grant of an employee stock option under a stock option plan is the offer and sale of a security. There's no question about it. Look at those decisions. That's what they say. And so we have a security because a stock option is defined by the statute to be a security. We have the sale of a security by the granting of a stock option. Google, Inc., Credit Karma. And your position is simply awarding a stock option to an employee constitutes a sale. That is correct. That is correct. And that's, we believe, and we would submit that if you look at Credit Karma and Google, Inc., that's exactly what those cases say. They found those companies sold unregistered securities to their employees by granting them employee stock options without having registered the offering, without having registered the stock options on a Form S-8 registration. That's whether or not there is any direct cost to the employee. That's correct. That's correct. These were, same scenario, these were compensatory stock options. So in exchange for the services that the employee is providing, you know, so if we think about that for value aspect of sale, these are compensatory stock options. They have built into them under the IRS code a vesting schedule. The services of the employee is a requirement of receiving the stock option and having it mature to the point where you could exercise it. So we have a security. We have a sale. Again, Google, Inc. and Credit Karma, I think, are determinative of that. We have a registration statement and a prospectus that has false statements in it. These are Enron's financials that are admittedly false. Judge Harmon said that's not an issue in the decision. These are admittedly false registration statements and prospectuses. And so then we have the factual questions of whether UBS is an underwriter under Section 11 or a seller under Section 12. And here the district court did not look into the factual allegations of the complaint and determine whether or not they were, the district court never said they were insufficient. And what the district court did was, relying on that sentence case, and sentence is very important, I think, for understanding where the district court went with the decision. Incendent, Judge Walls in New Jersey, looked to two other cases. And so Judge Walls in New Jersey had the context of an employee stock option plan. He looked at two other cases in rendering his decision. Both of those cases involved employee stock ownership plans. Those are ESOP plans. It's an, I'm sorry, it's an ERISA trust situation. And the question in those cases is whether an employee's interest in an ERISA trust is a security because it's an investment contract. In Incendent, the judge actually misquotes those cases, exchanging the word ownership plan for option plan, and makes those cases say something that they never said. And in this case, the district court looked at Incendent case and said, oh, well, clearly, looking at the Incendent case, the no-sale doctrine applies in this, to this context. Therefore, there's no sale. Because there's no sale, UBS cannot be an underwriter. It cannot be a seller. The appellants in this case cannot be a purchaser. And so the court's reliance on Incendent, which misquotes the cases it relied on from a different context, is how the district court wound up where it did, saying that there is no sale, there is no purchaser, there is no underwriter, there is no seller. And it's all dependent upon Incendent being correct. And as we demonstrate in the brief, Incendent is objectively wrong, and it needs to be corrected. It misquotes the cases it relies on and causes confusion in the context of an employee stock option plan. Statutory faithfulness is the correction. If we look at the statute itself, it determines this matter. The only circuit court to look at the Incendent case was the Ninth Circuit in Falkowski v. Imation Corp. And the Ninth Circuit there just said, we're not relying on Incendent. We believe it's wrong, because if you look at the statute itself, it determines the issue. Now, that court was looking at the 34 Act, but it applies equally here in the 33 Act context. The correction is faithfulness to the statute, and that's what we asked this court to do. So again, we have a security. We have a sale. We have misrepresentations in the registration statements. UBS is an underwriter, as the complaint alleges adequately, because of this contractual relationship that it had with Enron. UBS took on the responsibility of having its hand in every aspect of the distribution of these employee stock options. UBS is the only company that had a role with every aspect of the employee stock option plan. Once the Compensation Committee made the determination of who was going to receive a grant, UBS notified them. UBS kept all the paperwork. UBS maintained the Internet site where they would interact, the employees could interact and determine how many options do I have, when do they vest, if they wanted to exercise, they would call UBS. UBS maintained the account of Enron stock. If an employee were to determine to exercise the stock option, they would do that with UBS, and UBS would have the stock that would then be transferred to the employee's account. It was UBS who was at every stage of this distribution process, and that is the definition of underwriter. When you look at the statutory definition, when you look at the case law, UBS was an indispensable party to this distribution. Without UBS, this distribution wouldn't have taken place, at least according to the terms of the contract. UBS was the one who stood between the employees and the securities that were being issued to them, and UBS had responsibilities under the statute to ensure that the information that the employees received regarding these securities was accurate, was full, and that's why the statute places responsibility, statutory liability on them for these false statements. Briefly, I have just over a minute left. I want to say, too, that obviously the appellants concede nothing regarding the 1934 Act case. Time today is limited, and so I would refer the Court to the papers, the briefings on the 1934 Act case. You don't waive anything that's in your brief, so you're fine on that. Okay, thank you. Go ahead and argue it, but that's fine. Well, and I just want to say in the minute here that, you know, we do believe that the District Court committed error by not granting the motion for leave to amend. I mean, this procedural history, I think we can agree, is pretty unique, and to have the stay for... I still don't understand this eight-month delay after the CFO was deposed. Well, so if we put ourselves back in that time frame, we have Andy Fastow being deposed in the fall of 2006. This was also under the Court's docket order when all of the expert discovery was taking place. So the fall of 2006 was full of Fastow's deposition and every expert witness's deposition. The reports had just been finished. We're taking the deposition of the experts, and so the information that appellants want to add and sought to add in its amended complaint was not only the ten pages of allegations that came out of Fastow's deposition, but also a significant amount of information that came out of the expert depositions, positions relating to scienter, to duty. One of UBS's experts, Patricia Chadwick, testified that if it's the situation where UBS, a company in the position of UBS, becomes aware of fraud at an issuer, that they actually have an obligation to blow the whistle to the SEC. And so some of these questions about what duties did UBS have that would give rise to a duty to disclose are addressed by the expert depositions. And so in those months, all of that discovery was taking place, and we were seeking to incorporate all of that into the complaint. I see that I'm out of time. Yes, and you saved time for rebuttal, Mr. Augusto. Yes. Thank you. Mr. Jeffrey, you can pronounce that better than I can, so I'll welcome your correction. Good morning, Your Honor. It's Robert Jiffreau with Sullivan and Cromwell, and it's a pleasure to be here again in the Fifth Circuit. Let me just start with the 34-Act claim, because I think I can clear the brush pretty quickly. The 34-Act claim is identical to the 34-Act claim that was brought in a case called Giancarlo that was decided by this Court on February 26, 2018. Judge Graves was on the panel. This Court dealt with those issues. The complaint is exactly the same. This Court dealt with the issue of whether leave to amend, whether Judge Harmon abused her discretion in not granting leave to amend, and this Court focused on the point that Judge Smith did, which is that there were many months after Mr. Fastow's deposition, and plaintiffs sat on their hands. In fact, Mr. Fastow's deposition, he didn't say anything about UBS knowing about the fraud in Enron, and in any event, the plaintiffs waited five years to even seek to file yet another amended complaint. Let me focus on the 33-Act claim, which is at least a new claim in this case. The claim is about the grant of unexercised Enron options that were provided without any cash consideration, and all Payne-Webber did was provide certain recordkeeping assistance to Enron and also facilitated the exercise of the option. The folks that they're representing are just people who got the grants. That's it. They never exercised the grants, and this is an unprecedented theory. It's not one that any court has ever adopted, and it fails for four separate reasons. The first one is the one you focused on, Judge Higginbotham. They don't satisfy or they run right directly into the well-established no-sale rule. This is not a 33-Act sale because the options were granted for no cash consideration. The employees' fact that they were employed doesn't get them over the hump. Under the 34-Act, you don't need to have a sale for value, but under the 33-Act, you do. And since the 1980s, the SEC has repeatedly held, and in release after release, that a grant of 33-Act sale, and we cite the SEC release 336455, which is 1983, in which the SEC directs registrants and others that in a typical plan, the grant of options will not be deemed a sale of securities for purposes of the Securities Act. And that's also consistent with what courts have held. The other side talked about the Sendint case, which was from New Jersey, but there's a fiduciary trust case in the Southern District. There's a case for Northwest Airlines in Minnesota. There's a case from West Virginia called Bish, and these are all cited in our papers, page 53, note 26. It was reference made by the other side to a Google enforcement order. First of all, an enforcement action doesn't trump SEC learning or court decisions, but that consent order didn't mention the no-sale option, and it dealt with the context of Google being a pre-IPO company and someone individually bargaining for options in connection with going to work for Google as opposed to a situation where someone is working for a company and gets options, and those options are granted by the board, and there's no dispute about that in this case. In addition, under Section 11, you can only bring a claim against an underwriter or someone who offers or sells securities. UBS was not by any definition here an underwriter of securities. The record-keeping function it performed is not a distribution of options. All it did was facilitate the exercise of the options. Enron deposited shares in a UBS account, and if someone wanted to exercise those shares, UBS set up an account for that person. They could get the shares when they exercised the options and then diversify their portfolio. But again, the board was the entity that granted the options. Was UBS compensated in the same manner that an underwriter normally would be? Absolutely not. What was the compensation? It was a contract that provided that you got a certain amount of money for running the exercise part of this plan. The big benefit for UBS from doing this was that folks who were Enron employees had accounts at UBS and then would do trades out of the Enron shares into, you know, Apple or some other or some other, Apple wouldn't have been the share they would have bought back then, but Enron or something else like that. Or you could have gone, excuse me, into Exxon or, you know, Bank of America or some other stock. That was where UBS made money from doing this. It was really something where they were not doing what an underwriter traditionally does, which is due diligence. There's no registration statement that says UBS was the underwriter of these securities. The only registration statement was a Form S-8, which is a particular form that's used in the context of employee stock options. The normal underwriter does what's called an S-1 when you sell shares to the public. That's not what went on here, and UBS certainly was not denominated or even referenced in the document that the other side is claiming was the registration statement. UBS didn't own the options. Normally, when you are an underwriter, you buy the shares from the issuer, and then you distribute them and sell the shares. Here, the options were not transferrable by the OPE. UBS never took title to the options. They never bought the options, so they didn't perform any of the normal functions that one attributes to an underwriter. You also, you know, so first of all, the other side runs up against the no-sale doctrine. Number two, they run up against the fact that UBS was not an underwriter, as understood for purposes of Section 11, and it was not a seller for purposes of Section 12. Then they have the problem of you need a false statement in a registration or prospectus that you contribute to the underwriter or to the seller of the securities. And again, these Form S-8, which is the document that they're focused on, didn't register or offer options. You don't register or offer options. You register stock, and the Form S-8 simply registered the stock that would ultimately be exchanged for the options. Options don't, as a matter of law, need to be registered. Now, the last point, so you've got, again, no-sale doctrine, not an underwriter or seller. There's no registration statement or prospectus that can be attributed to UBS. And then the last point, which may well be the easiest point of all for the Court to rule on, is if I were working for Enron and they handed this option, whatever you want to call it, stock, what do I have? All you have is a piece of paper that gives you the right to exercise the option at a point in time for a certain price. At a price. It's indexed to price. Correct. The classic definition of an investment contract is when a person places his resources in the hands of a management. In other words, the risk of the loss is in the hands of a manager, right? That's correct. If we're asking the question of whether something's an investment contract, but that definition of placing the—which is indexed by where does the risk fall? That is, the risk—when I invest in a stock, depending on the management, their skill or lack of skill, that's what's going to determine the value of it, right? Correct. Well, if I'm holding an option to buy that stock, the weakness is, you say, in essence, I have not made an investment. You're getting something without putting any cash into it, and that's why the no-sale rule bars the claim that they're seeking to bring here, and that's why the SEC and courts have repeatedly held that when an employee gets an option, they don't have a claim against their employer. Now, plaintiffs here would like to go one step further and have you authorize a claim against a bank that essentially just set up accounts so people could sell the shares that they got when they exercised the option and diversify their portfolio and get Exxon stock or some other company, IBM stock. And certainly, EBS was not performing the function of an underwriter, as anyone would define that term. I understand your argument, underwriter. I was just trying to get back to the definition of security. An option can be a security. There's no question about that, but it's got to be, for purposes of the 33 Act, a security for some sort of cash consideration, and there was no cash consideration here, and the SEC and courts have all held that the no-sale doctrine, which is well-established, rejects the theory they're putting forward. The last problem that the other side has is they have no 33 Act damages because Enron granted the options for no cash consideration. The plaintiffs didn't pay for the options, and under Section 11, damages are calculated based on the difference between the amount you pay for the securities and what the value was later, but here you didn't pay anything for them, so you have no damages. Under Section 12, which is the other theory they're operating under, you can recover for the consideration paid versus what it was worth at some date down the road. In both instances here, Section 11, Section 12, the employees didn't pay anything for these options. They worked, there's no question, in order to get them, but courts have held that that is not a form of consideration that qualifies as being cash consideration as required for Section 11, and so non-cash services are not a valid form of 33 Act damages. Anything else? Any other questions? If the Court has no further questions, I will rest on our papers. Thank you very much. Thank you. Mr. Augustus, you've saved time for rebuttal. Thank you. So if I may, the issue of confusion of context is the fact that the district court went into this determination of whether or not a stock option qualifies as a security because it's an investment contract. That's what Daniels talks about. That's what Howey talks about. That's what the 1980 release talks about. That's not the right context. An employee stock option is a security because the definition of security under the 1933 Act says that a stock option is a security. It's one of the enumerated securities in the list. So we never get into that question of whether it qualifies as an investment contract. We don't have to get there because the statute itself defines it to be a security, and so that's what we talk about when we talk about statutory faithfulness. The statute itself defines a stock option to be a security. With regard to this no-sale doctrine, the Google Inc. situation, the Credit Karma situation, was not the situation of individual employees negotiating for stock options. These were all employee benefit plans. Google, when they were found to have violated Section 5, it was because they had issued more than $80 million of employee stock options. Credit Karma is the same thing. These are private companies, yes, but it's the same general rule. A security must either be registered or exempt from registration, and as private companies they had a potential registration under Rule 701, but they didn't meet the parameters of that rule, of that exemption, and so they either had to register the security or it had to be exempt for some other reason. The SEC found that there was no viable exemption from registration. The stock options themselves had to be registered, and the way you register a stock option, as Mr. Gifford said, is using a Form S. 8 registration statement. On the face of that registration statement, it lists the amount of common stock that's being registered as part of the plan, but that's solely for purposes of determining the fee associated with the registration. There is under Rule 416C the statement that says on a Form S. 8 registration statement every interest in the plan, in the employee benefit plan that is a security, an indeterminate amount of those securities are deemed registered under the Form S. 8 registration statement. So as a matter of law, as a matter of Rule 416C, the stock options are registered under the Form S. 8 registration statement. That shouldn't even be a question. As far as the damages are concerned, I would say two things about that. First is that this is a Rule 8 pleading standard. We're at a motion-to-dismiss stage. We have adequately pled damages as a first matter. But as a second matter, talking about those experts' depositions and reports that were done, again, we're in a really odd situation where we've completed discovery. We're ready for trial, and then the case is dismissed on a motion to dismiss. So it's on a pleading standard. So it's a little bit odd in that sense. But we have expert reports. We have expert depositions that quantify the damages in these cases. It's based on this notion of a Black-Scholes model, the value of employee stock options. It's a whole area of expertise and damage calculation. So we've adequately pled it, but just so you know, we don't end up back on a motion for summary judgment because there's no damages. We have evidence of the damages that have been produced in the case. I would also say that a Section 11 underwriter, the case law makes clear that anyone who performs a substantial function in a distribution is deemed an underwriter. That's SEC v. Chinese Consulate Benevolent Corp. out of the Second Circuit in 1941, well-established law, that who is an underwriter under the statute is a broad category, and it encompasses everyone who takes a part of the distribution process on as, you know, if you take that part of the, if you become a necessary part of the distribution process, then you're an underwriter. And in this case, UBS contracted with Enron to perform the entire distribution process to its employees. And the reason it did it was not for that administrative fee, but it was for that opportunity to have every Enron employee become a UBS client. If you think about the number of Enron employees that were granted Enron stock options, and they had to go to UBS, they had to establish a UBS account. When they had to deal with UBS, when they exercised an option and they got the cash, they were already, you know, had an account at UBS. UBS could just facilitate their additional transactions that they wanted to do. It was a gold mine. UBS knew what it was doing when it put itself into this position, and it did it for its own financial gain, which also was one of those key components for seller. So I see that I'm out of time. Thank you very much. Thank you, Mr. Augustus. Your case is under submission.